COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton and Kelsey
Argued at Richmond, Virginia


ORILLION DENVER CRADDOCK
                                              OPINION BY
v.   Record No. 2801-01-2           JUDGE D. ARTHUR KELSEY
                                              MAY 13, 2003
COMMONWEALTH OF VIRGINIA


            FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                        Robert W. Duling, Judge

            Cynthia E. Payne, Assistant Public Defender,
            for appellant.

            Richard B. Smith, Senior Assistant Attorney
            General (Jerry W. Kilgore, Attorney General,
            on brief), for appellee.


     Orillion Denver Craddock contends the trial court erred by

not suppressing evidence discovered during a strip search prior

to his pretrial incarceration.  Craddock also claims the

evidence at trial does not support his convictions for

obstruction of justice and possession of cocaine with the intent

to distribute.  Disagreeing with both assertions, we affirm.

                              I.

     On appeal, we review the evidence "in the light most

favorable to the Commonwealth."  Morrisette v. Commonwealth, 264

Va. 386, 389, 569 S.E.2d 47, 50 (2002).  That principle requires

us to "discard the evidence of the accused in conflict with that

of the Commonwealth, and regard as true all the credible

evidence favorable to the Commonwealth and all fair inferences that may be drawn therefrom." Holsapple v. Commonwealth, 39 Va. App. 522, 528, 574 S.E.2d 756, 758-59 (2003) (en banc) (citation omitted); see also Wactor v. Commonwealth, 38 Va. App. 375, 380, 564 S.E.2d 160, 162 (2002).

On April 17, 2001, Officer Robert Barlow of the Richmond Police Department conducted a "routine patrol" through a "high drug" area of Richmond. He observed a "group of gentlemen standing on the corner." Barlow exited his patrol vehicle, approached the men, and asked for identification. Once he received each man's identification, Barlow performed a record check on each "to see if there were any warrants on file." Barlow learned that pending process existed charging Craddock with "failure to appear on a felony narcotics charge."

Barlow arrested Craddock and placed him in the police cruiser for transport to the "detention center." The detention center served as an "annex of the jail, under the jurisdiction of the Sheriff of the City of Richmond." The center processed about "450 to 500 prisoners" each week and anywhere "from 130 to 500" prisoners would be in the center at any given time. The guards at the detention center were responsible for "sending those particular prisoners to each and every court in the city in a timely fashion."

While en route to the detention center, Officer Barlow received a phone call from Officer Michael Bender. Bender had

-

heard Craddock's name over the radio dispatch and called Barlow to explain that, in the recent past, Craddock had kept drugs "hidden in his underwear" and "was known to carry drugs in his buttock area." Bender knew this because he "was the officer who got the search warrant for the prior drugs that had been retrieved."

Barlow relayed this information to Deputy Sheriff Kenneth Droddy, the assistant commander of the detention center. Droddy testified that he was informed that Craddock was on bail for a "felony possession with intent to distribute" charge. In that earlier proceeding, which occurred about "two months prior," a search warrant had been issued "because Mr. Craddock had secreted the particular narcotics in his anal cavity." Deputy Droddy was also "familiar with Mr. Craddock because of previous incarcerations." Craddock had been previously convicted of two felonies. Droddy also knew Officer Barlow had arrested Craddock at a place known to be a "hangout or location for the sale of narcotics."

After his arrival at the detention center, Craddock was "processed to go into jail" with the understanding that he had been "brought into the sheriff's custody on a commitment brought by the magistrate for failure to appear." Craddock initially appeared calm and did not seem "nervous or agitated in any way." When a deputy conducted a routine pat-down search of Craddock, however, Craddock "seemed to be a little jumpy." After the

-

pat-down search, Barlow brought Craddock to the "lockup" section.

"When he got down to lockup," Barlow testified, Craddock "started to get nervous." Barlow asked Craddock if he was carrying any contraband and explained to him "that it is an additional charge for bringing any illegal type of contraband into the jail setting." Acting "very nervous," Craddock denied having any contraband. Deputy Droddy then "called Mr. Craddock over and expressed to him . . . that I possibly thought that he may have something on him." "At that very second" Craddock's demeanor changed "one hundred percent," going "from being very calm and collective to being very nervous, very fidgety."

Pursuant to written policies promulgated by the sheriff, deputies had authority to "strip search" a detainee at the detention center if they had "reason to believe" the detainee may be hiding contraband. Acting in accord with this policy, Deputy Droddy informed Craddock that the deputies would conduct a strip search. Craddock initially consented. The deputies escorted him to a "secluded" cell where the search could take place with some measure of privacy.

After entering the holding cell, Craddock claimed that it was "too cold" for a strip search. On three occasions during this conversation, Deputy Droddy explained to Craddock that it was necessary to conduct a strip search. When Craddock began to resist, the deputies used "pepper spray" to subdue him.

-

Craddock then "began fighting and thrashing around so dramatically that it was impossible" for the officers to conduct the search.

Craddock continued to fight the deputies for about three to four minutes. During this struggle, Droddy informed Craddock "for the fourth and fifth times that he had to submit to the test." Droddy also informed Craddock that if he "calmed down," Droddy would allow him to remove his own garments. Craddock nonetheless "continued thrashing around, hollering no, and kicking at the officers holding his feet." Only after several minutes of struggling did Craddock grow tired enough that he relaxed. At that point, Droddy determined that the deputies could remove Craddock's clothing "without injuring him or without one of us getting injured."

A deputy removed Craddock's socks and shoes, "then pulled his pants down by using the outer pants legs." Despite Craddock's renewed struggles, the deputies pulled Craddock's underwear down. Droddy observed a plastic bag with suspected narcotics between Craddock's "butt cheeks." Droddy made this initial observation without the need to spread Craddock's "butt cheeks apart" or to "manipulate his cheeks."

Craddock began to clench "his buttocks together so forcefully that it was almost like he was lifting weights or something like that." Droddy could still see the bag "protruding from his butt cheeks." As the physical struggle

-

continued, the deputies eventually pulled Craddock's legs apart. Droddy picked up the bag, which was then resting "on top" of Craddock's anus. Droddy testified that he did not "pull it out" from Craddock's buttocks. "All I had to do," Droddy explained, "was pick it up."

Craddock continued to fight with the deputies even after they removed the narcotics from his body. As Droddy gathered some of Craddock's belongings from the floor of the cell, "Craddock lunged up off of the bench" at Droddy. Because of this, Droddy "had to engage in another physical altercation with Mr. Craddock, restraining him again."

Deputy Droddy testified that he conducted the strip search of Craddock because of two concerns. First, "it is necessary for me to prevent those items from getting into the facility." Inmates "tend to use contraband, especially . . . narcotics, as a source of power within the facility." Internal strife and violence inevitably result from the introduction of drugs into the jail. Second, Droddy believed the narcotics created "health issues as far as Mr. Craddock was concerned." Drugs in the anal cavity could make inmates "sick to the point where they are actually deathly ill, and we have had to take them to the hospital." A physician specializing in toxicology testified at trial that the amount of crack cocaine possessed by Craddock would have been "lethal" if the bag had burst and the cocaine had been absorbed directly into the anal membranes.

-

These were not hypothetical concerns, Droddy testified. On at lease twelve occasions, deputies had "recovered drugs off of people being brought in through the lockup." On two occasions, detainees had secreted narcotics "in a body cavity."

The bag of narcotics taken from Craddock contained twelve, separately wrapped, "plastic bag corners" with a total weight of 2.556 grams of crack cocaine. The grand jury indicted Craddock for possession of cocaine with intent to distribute. See Code § 18.2-248. Craddock remained incarcerated up to the time of trial.

Prior to trial, Craddock's counsel moved to suppress the cocaine obtained during the strip search. The trial judge overruled the motion, holding that "the officers had an obligation and duty to search the gentleman before he went into the population of the lockup and/or the jail, of which I consider one to be a part of the other." After hearing the evidence, the trial court found Craddock guilty of obstruction of justice, in violation of Code § 18.2-460(C), and guilty of possession of cocaine with the intent to distribute, in violation of Code § 18.2-248(A).

## II.

Though the ultimate question whether the officers violated the Fourth Amendment triggers de novo scrutiny on appeal, the trial court's findings of "historical fact" bind us due to the

-

weight we give "to the inferences drawn from those facts by resident judges and local law enforcement officers." Davis v. Commonwealth, 37 Va. App. 421, 429, 559 S.E.2d 374, 378 (2002) (citing Neal v. Commonwealth, 27 Va. App. 233, 237, 498 S.E.2d 422, 424 (1998)). We examine the trial court's factual findings only to determine if they are plainly wrong or devoid of supporting evidence. See Mier v. Commonwealth, 12 Va. App. 827, 828, 407 S.E.2d 342, 343 (1991).

In addition, the appellant must shoulder the burden of showing that the trial court's decision "constituted reversible error." McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc) (citations omitted); see also Davis, 37 Va. App. at 429-30, 559 S.E.2d at 378. "Absent clear evidence to the contrary in the record, the judgment of a trial court comes to us on appeal with a presumption that the law was correctly applied to the facts." Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977); see also Oliver v. Commonwealth, 35 Va. App. 286, 297, 544 S.E.2d 870, 875 (2001) ("The trial court's judgment is presumed to be correct.").

### III.

#### A.

Relying on cases addressing searches incident to arrest, Craddock argues that the officers conducted a warrantless and personally intrusive search in violation of the Fourth

-

Amendment. In reply, the Commonwealth contends that no constitutional violation occurs where, as here, guards conduct a strip search of a detainee being admitted into the general population of a penal facility for the express purpose of preventing contraband from entering the facility. This particular search, the Commonwealth continues, did not exceed reasonable scope and manner limitations.

We begin our analysis with a definition of terms. A "strip search" involves "an inspection of a naked individual, without any scrutiny of his body cavities." Kidd v. Commonwealth, 38 Va. App. 433, 446, 565 S.E.2d 337, 343 (2002). A "visual body cavity search" goes further and "extends to a visual inspection of the anal and genital areas." Id. (citation omitted). A "manual body cavity search," the most intrusive search, entails "some degree of touching or probing of body cavities." Id. (citation omitted); see also McCloud v. Commonwealth, 35 Va. App. 276, 282-83, 544 S.E.2d 866, 869 (2001).

We next turn to the governing legal principles. The Fourth Amendment proscribes only "unreasonable searches and seizures," McNair v. Commonwealth, 29 Va. App. 559, 563, 513 S.E.2d 866, 868 (1999) (en banc), not reasonable ones. A standard "not capable of precise definition or mechanical application," Bell v. Wolfish, 441 U.S. 520, 559 (1979), reasonableness hinges on the facts of each case. Depending upon the circumstances, reasonableness may permit police officers to conduct warrantless

-

searches ranging from "a generalized search of the person to the more intrusive strip search or body cavity search." Hughes v. Commonwealth, 31 Va. App. 447, 455, 524 S.E.2d 155, 159 (2000) (en banc).

Under the Fourth Amendment, an officer's authority to conduct a "full search" incident to arrest "is only skin deep." Commonwealth v. Gilmore, 27 Va. App. 320, 328, 498 S.E.2d 464, 468 (1998). Officers cannot, for example, strip search "minor non-jailable offenders" incident to their arrest without a showing of "reasonable suspicion" that they possess contraband or weapons. Taylor v. Commonwealth, 28 Va. App. 638, 642, 507 S.E.2d 661, 663 (1998) (barring a strip search of an arrestee on a misdemeanor charge of public intoxication where the arrestee was not being admitted to the general jail population). Officers may not conduct a manual body cavity search unless "exigent circumstances" exist, coupled with a "clear indication" that evidence is "located within a suspect's body." Gilmore, 27 Va. App. at 330-31, 498 S.E.2d at 469; see also Moss v. Commonwealth, 30 Va. App. 219, 226, 516 S.E.2d 246, 249-50 (1999).

A different set of principles governs institutional searches of pretrial detainees being processed for admission in the general population of a penal facility. In Bell, 441 U.S. at 558, pretrial detainees challenged a prison policy requiring them "to expose their body cavities for visual inspection as a

-

part of a strip search conducted after every contact visit with a person from outside the institution."  The prison policy did not require any showing of individualized suspicion, but rested solely on the institutional goal of deterring "the smuggling of weapons, drugs, and other contraband into the institution."  Id. The United States Supreme Court upheld the search policy, which included both strip searches and visual body cavity searches, holding that "significant and legitimate security interests of the institution" warranted the intrusive search.  Id. at 560.

Bell grounded its holding on unique institutional concerns, well known to the courts, about the prevalence of drugs and weapons in the nation's correctional facilities.

> A detention facility is a unique place
> fraught with serious security dangers.
> Smuggling of money, drugs, weapons, and
> other contraband is all too common an
> occurrence.  And inmate attempts to secrete
> these items into the facility by concealing
> them in body cavities are documented in this
> record[.]

Id. at 559 (citations omitted); see also Marrero v. Commonwealth, 222 Va. 754, 757, 284 S.E.2d 809, 811 (1981) (Possession of "drugs and weapons by inmates is a problem facing prison officials everywhere."); Beamon v. Commonwealth, 222 Va. 707, 709, 284 S.E.2d 591, 592 (1981) (Correction officials face an "urgent necessity of preventing, so far as possible, the introduction into the prison of drugs and weapons.").

-

Though the record in <u>Bell</u> disclosed only one prior occasion where a detainee attempted to smuggle contraband into the facility, that fact did not dilute the rationale for the strip searches.

> That there has been only one instance where an MCC inmate was discovered attempting to smuggle contraband into the institution on his person may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises.

<u>Id.</u> at 559.

In the context of detainee strip searches, the rule of reason enforced by the Fourth Amendment cannot be simplified into an analytical tool of "mechanical application." <u>Id.</u> Instead, the reasonableness test requires a fact-specific balancing of individual and institutional interests:

> In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. <u>Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted</u>.

<u>Id.</u> (emphasis added).

In our case, guided by the balancing test of <u>Bell</u>, we first address the "scope of the particular intrusion." <u>Id.</u> at 559. The trial court found that the deputies discovered the contraband during a strip search of Craddock, not a visual or

-

manual body cavity search. This factual finding rests on credible evidence. Deputy Droddy observed the bag between Craddock's "butt cheeks" before the deputies spread his legs apart during the struggle. The bag was "sitting actually on top of his anus." To retrieve the bag, Droddy "didn't have to pull it out" of Craddock's anus. Instead, Droddy explained, "all I had to do was pick it up." These facts describe an inspection of the exterior of Craddock's buttocks, not a specific visual or manual examination of his anal cavity.

We next consider the "manner" in which the search was conducted. Id. The deputies removed Craddock's clothes, but did not intrude into any body cavity. Although the deputies physically restrained Craddock, who forcibly resisted the search, their force was necessary to prevent Craddock from injuring himself and the deputies. The search took place in a secluded holding cell, a reasonable place for a strip search. No other detainees or officers were present. Given these circumstances, the officers did not "conduct the search in an abusive fashion." Bell, 441 U.S. at 560.

Finally, we must examine the "justification" for the search and the "place in which it is conducted." Id. at 559. This particular detention center served as "an annex of the jail" and housed hundreds of detainees, many of whom required transportation to local courts. In this respect, the detention center appears quite similar to the "short-term custodial

-

facility" in Bell, which had been "designed primarily to house pretrial detainees" and was "located adjacent" to the federal courthouse.  Id. at 523.

The justification for the search given in Bell likewise applies here.  The detention center faced an urgent need to prevent the entry of drugs into the facility.  The entry of drugs into the facility compromised the safety of inmates and officers alike.  Inmates hiding cocaine in the anal cavity faced an additional danger, possibly a lethal one, of drugs being released into the rectal membranes.  These concerns amply justify the sheriff's policy of authorizing strip searches where the deputies had, as Deputy Droddy did here, "reason to believe" the detainee was concealing contraband.[1]

Viewed in the light most favorable to the Commonwealth, the evidence concerning the scope, manner, justification, and place of Craddock's strip search comports with the standard of

---

[1] The Commonwealth argues that the sheriff's strip search policy, by imposing a form of individualized suspicion requirement, goes considerably further than the Fourth Amendment balancing test in Bell demands —— particularly given the fact that Craddock was charged with a felony drug offense and placed in the general population of the jail.  See Illinois v. Johnson, 778 N.E.2d 772, 779-80 (Ill. App. Ct. 2002) (Under the Bell rationale, "good penal practices not only permit, they require strip searches before placing detainees into the general jail population.").  Because this case does not present that specific issue for us to decide, however, we decline the "invitation to render an advisory opinion" on the subject.  Commonwealth v. Harley, 256 Va. 216, 220, 504 S.E.2d 852, 854 (1998).  Whether Bell forbids suspicionless strip searches of pretrial felony detainees is a question that we do not resolve.

-

reasonableness required by the Fourth Amendment.  The trial court, therefore, did not err in denying Craddock's motion to suppress the drugs discovered during this search.[2]

B.

Craddock next argues that the Commonwealth failed to provide sufficient evidence to support his conviction for obstruction of justice.  We disagree.

The crime of obstruction of justice occurs when "any person by threats of bodily harm or force knowingly attempts to intimidate or impede . . . any law enforcement officer, lawfully engaged in the discharge of his duty . . . ."  Code § 18.2-460(C).  To violate the statute, the defendant must intend to impede an officer "in the performance of his duties." Woodson v. Commonwealth, 14 Va. App. 787, 795, 421 S.E.2d 1, 6 (1992).  Impeding an officer's duties does not require the

---

[2] In his suppression motion, Craddock also asserted that the strip search violated the Virginia Constitution and Code § 19.2-59.1.  Neither assertion has merit.  Virginia courts "have consistently held that the protections afforded under the Virginia Constitution are co-extensive with those in the United States Constitution."  Sabo v. Commonwealth, 38 Va. App. 63, 77, 561 S.E.2d 761, 768 (2002) (quoting Henry v. Commonwealth, 32 Va. App. 547, 551, 529 S.E.2d 796, 798 (2000), and Bennefield v. Commonwealth, 21 Va. App. 729, 739-40, 467 S.E.2d 306, 311 (1996)).  In concluding that Craddock's search does not violate the Fourth Amendment, therefore, we likewise find no violation of the analogous provisions of the Virginia Constitution. Further, Code § 19.2-59.1 does not apply to felony detainees, McCloud, 35 Va. App. at 281, 544 S.E.2d at 868, and, in any event, does not provide a statutory suppression remedy for alleged violations, Taylor, 28 Va. App. at 641, 507 S.E.2d at 663.

-

defendant to commit "an actual or technical assault upon the officer." Love v. Commonwealth, 212 Va. 492, 494, 184 S.E.2d 769, 771 (1971). Rather, "there must be acts clearly indicating an intention on the part of the accused to prevent the officer from performing his duty, as to 'obstruct' ordinarily implies opposition or resistance by direct action." Ruckman v. Commonwealth, 28 Va. App. 428, 429, 505 S.E.2d 388, 389 (1998).

In this case, Craddock physically resisted a lawful search and continued his obstructive behavior even after the search. The trial court, therefore, did not err in finding the evidence sufficient to demonstrate Craddock's intent to prevent the officers from performing their duties. Ruckman, 28 Va. App. at 429, 505 S.E.2d at 389.

### C.

Craddock's final challenge contends that the evidence failed to prove that he possessed the cocaine with an intent to distribute. Once again, we disagree.

An individual violates Code § 18.2-248(A) when he possesses "the controlled substance contemporaneously with his intention to distribute that substance." Christian v. Commonwealth, 33 Va. App. 704, 716, 536 S.E.2d 477, 483 (2000) (en banc) (citation omitted). Because of the difficulty of proving intent directly, the Commonwealth may (and often must) rely instead on circumstantial evidence. Morrison v. Commonwealth, 37 Va. App.

-

273, 281, 557 S.E.2d 724, 728 (2002). Several factors, when viewed together, can provide circumstantial "probative evidence of intent" to distribute drugs. McCain v. Commonwealth, 261 Va. 483, 492, 545 S.E.2d 541, 547 (2001). Many of these factors exist in this case.

First, the trial court qualified Officer Barlow as an expert witness "in the field of street drug distribution." He had arrested "numerous" drug users, as well as dealers, and had coordinated controlled buys from street-level sellers. In the process, he had debriefed users and dealers on various aspects of the drug trade.

Barlow testified that "most users would use one rock a day." One rock, he explained, weighs approximately .2 grams. Craddock carried "12 rocks of crack cocaine" weighing 2.556 grams, considerably more than one would expect to find on a mere user. This amount, in Barlow's opinion, was "inconsistent with personal use." See, e.g., Clarke v. Commonwealth, 32 Va. App. 286, 304, 527 S.E.2d 484, 493 (2000) (possessing drugs in an amount greater than that for personal use indicates intent to distribute). The toxicologist agreed, testifying that the amount of cocaine possessed by Craddock "would be lethal if it was given to an individual all at one time." "It is about ten times what people would normally take."

Second, Craddock did not possess any drug paraphernalia and, as Barlow testified, typical users of crack cocaine

-

ordinarily "would have some type of smoking device on them." See Welshman v. Commonwealth, 28 Va. App. 20, 37, 502 S.E.2d 122, 130 (1998) (en banc) (recognizing the absence of drug "paraphernalia suggestive of personal use" as evidence of an intent to distribute).

Third, each of the twelve rocks of crack had been "individually packaged," indicating that the cocaine could be sold in small, individual quantities. Id. (method of packaging should be considered). Drug users usually carry one or two individually packaged rocks for personal use, Barlow explained, while retail dealers usually carry more as inventory.

Fourth, despite his many arrests and debriefing sessions, Barlow testified that he personally had never observed users "have the drugs in their buttocks." In contrast, he pointed out, dealers often concealed drugs "in between their butt cheeks."

Fifth, Barlow arrested Craddock in a "known hangout or location for the sale of narcotics." See, e.g., Kidd v. Commonwealth, 38 Va. App. 433, 448-49, 565 S.E.2d 337, 344-45 (2002) ("[T]he characterization of the area in which an accused was arrested as an area known for drug transactions has been found to be another relevant factor in determining intent.").

Sixth, Craddock argued at trial that a "reasonable hypothesis would be he was holding the drugs as accommodation, not for profit." Code § 18.2-248, however, does not distinguish

-

between profit and not-for-profit distribution for purposes of criminal liability. "Whether a defendant acted only to accommodate another is a determination to be made after guilt has been decided and in contemplation of the penalty to be imposed." Foster v. Commonwealth, 38 Va. App. 549, 555, 567 S.E.2d 547, 550 (2002). An intent to accommodate, conceptually speaking, is a subset of the intent to distribute. See Code § 18.2-248(D).

The combined force of these evidentiary factors, coupled with Craddock's concession on accommodation, provided a sufficient basis for the trial court to find that Craddock intended to distribute the drugs found in his possession.

IV.

In sum, the trial court did not err by denying Craddock's motion to suppress. Applying the balancing test of Bell, the pre-admission strip search of Craddock did not violate the Fourth Amendment's proscription against unreasonable searches. The evidence also sufficiently established Craddock's guilt for obstructing justice and for possessing cocaine with an intent to distribute.

Affirmed.

-