COURT OF APPEALS OF VIRGINIA


Present:   Judges Kelsey, Haley and Senior Judge Bumgardner
Argued at Chesapeake, Virginia


NATHANIEL BOWE, JR.

v.      Record No. 0685-09-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE JAMES W. HALEY, JR.
APRIL 6, 2010


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Jerrauld C. Jones, Judge

J. Barry McCracken, Assistant Public Defender (Office of the Public
Defender, on brief), for appellant.

Gregory W. Franklin, Assistant Attorney General (William C. Mims,
Attorney General, on brief), for appellee.


I.

After a bench trial, the circuit court found Nathaniel Bowe, Jr. ("Bowe") guilty of

possessing cocaine and heroin, each with the intent to distribute, in violation of Code § 18.2-248.

The sole question for resolution on appeal is whether the circuit court erred in denying Bowe's

pretrial motion to suppress the drugs. For the following reasons, we affirm.

II.

Facts

On March 17, 2008, Officers Killian and Hoggard of the Norfolk police observed Bowe

walking towards a vehicle on property belonging to the Norfolk Redevelopment and Housing

Authority ("NRHA"). Killian was familiar with Bowe because on a previous day Killian had

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

personally ordered Bowe to stay off of all NRHA property, and, for this reason, Killian exited his police car, approached Bowe, and reminded him that he was banned from the property. According to Killian, Bowe replied that he did remember this, but instead of leaving, Bowe told Killian that: "[Killian] couldn't keep [Bowe] from coming on the property to visit his people, and that [Bowe] would come out there whenever he wanted." Killian arrested Bowe for trespassing.

There was conflicting evidence as to what happened next. Killian testified that, after first placing Bowe in handcuffs, he personally conducted a search of Bowe's person incident to that arrest. According to Killian, he was the only one to search Bowe and Killian did not remove Bowe's pants or expose Bowe's buttocks to public view during the course of the search. But according to Bowe's cousin, Ricardo Cabarrus ("Cabarrus"), the younger officer – Killian testified that Hoggard was the older of the two policemen – was the officer who placed Bowe in handcuffs, but then left Bowe in the custody of the older officer, Hoggard, so that Killian could search Cabarrus. Cabarrus further testified that it was the older officer, not the younger one, who searched Bowe and that during this search the older officer pulled down Bowe's pants and underwear. Bowe's testimony regarding the incident was consistent with Cabarrus's and inconsistent with Killian's. But whoever searched Bowe, all the witnesses agreed that the police did not discover any drugs as a result of the search of Bowe at the scene of his arrest. The police then took Bowe to the police station, as he remained under arrest for trespassing.

At the police station, Killian told a sheriff's deputy to conduct a second "thorough search" of Bowe. But before the deputy conducted any search, Killian asked Bowe whether he had any narcotics. Killian testified that Bowe told him: "Yes. I have the dope in my ass." Killian further testified that, "I asked him if he wanted to recover it, or if he wanted me to, due to the fact that I thought it would be less intrusive if he went ahead and recovered it himself."

Killian did not give Bowe a warning pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), before asking Bowe about drugs. Killian put his own hand into a rubber glove after Bowe's statement about the drugs, but before asking Bowe whether he preferred to retrieve the drugs himself or submit to Killian's retrieval of the drugs. After Bowe retrieved a bag from his body cavity, he gave it to Killian. Inside the bag were nineteen clear capsules, each containing off-white powder, and eighteen smaller plastic bag corners, each containing white, solid material. A certificate of analysis from the Department of Forensic Science was later introduced into evidence at Bowe's bench trial. According to the certificate, the off-white powder in the capsules was cocaine and the white material in the plastic bag corners was heroin.

During the hearing on Bowe's pretrial motion to suppress, Deputy Sheriff Williams ("Williams") described the method of searching arrested persons who arrive at the booking area. Williams said that the following procedure takes place before arrested prisoners are brought before a magistrate for bail determination.

> Q: Could you tell us what that standard procedure is?
>
> A: Start from the shoulders in the neck area, then the armpits, work my way down. I do a sweeping motion with both hands around the waist, then I proceed to pull the T-shirt up. I hold the T-shirt to the middle of the back where I can see the buttocks and the waistband region. Pull the pants and underwear from the body, and then I proceed to the pockets, then down to the legs.

Williams also described a second, more thorough, search, which takes place after the arrested person goes before the magistrate and before the person is incarcerated in the detention center.

> A: Once the person has been booked, processed, they're sent into a facility. They're taken up by a clothing deputy. The clothing deputy will take the inmate over to a specific area in the jail. They pull back the curtain, have the inmate take off all outerwear civilian clothing, all underwear. They have to squat, cough, then they're given a jumpsuit and their particular laundry; sheets, blankets, things of that nature.

Q:     This takes place only after the magistrate has not granted
       bond and they're been ordered to be detained in the jail
       itself?

A:     Yes.

The trial court granted Bowe's motion to suppress the statement ("Yes. I have the dope in my ass."), because Bowe was in custody at the time he made the statement and Killian did not give any <u>Miranda</u> warnings before asking whether he had drugs.[1] The trial court also stated that he found Cabarrus's account of the search of Bowe at the scene of Bowe's arrest to be "completely truthful." Yet the trial court denied Bowe's request to suppress the evidence of the drugs, reasoning that Bowe's arrest for trespassing was supported by probable cause and that the sheriff's deputies would inevitably have discovered the drugs, even if Bowe had never made the unwarned statement. This appeal followed.

III.

Analysis

In reviewing a trial court's denial of a motion to suppress, we consider the evidence in the light most favorable to the Commonwealth. <u>McGee v. Commonwealth</u>, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (en banc). "[A] defendant's claim that evidence was seized in violation of the Fourth Amendment presents a mixed question of law and fact that we review *de novo* on appeal." <u>King v. Commonwealth</u>, 49 Va. App. 717, 720, 644 S.E.2d 391, 392 (2007) (citing <u>Ornelas v. United States</u>, 517 U.S. 690, 691 (1996)).

Ordinarily, evidence obtained in violation of the Fourth Amendment, <u>Mapp v. Ohio</u>, 367 U.S. 643, 655 (1961), the Fifth Amendment, <u>Murphy v. Waterfront Comm'n of New York Harbor</u>, 378 U.S. 52, 79 (1964), <u>overruled in part on other grounds</u> <u>United States v. Balsys</u>, 524

---

[1] As the Commonwealth has not appealed this ruling, we express no opinion as to whether it was correct.

U.S. 666, 680-81 (1998), or the Sixth Amendment, <u>United States v. Wade</u>, 388 U.S. 218, 240-41 (1967), is inadmissible in the criminal trial of a defendant who has standing to object to that evidence. This exclusionary rule also applies to certain secondary or derivative evidence that the police discover as a result of certain constitutional violations. <u>See</u> <u>Silverthorne Lumber Co. v. United States</u>, 251 U.S. 385, 391-92 (1920); <u>Wong Sun v. United States</u>, 371 U.S. 471, 484-87 (1963). There are exceptions to the exclusionary rule and the related "fruit of the poisonous tree doctrine." And one of them is the inevitable discovery exception. <u>Nix v. Williams</u>, 467 U.S. 431, 443 (1984); <u>Warlick v. Commonwealth</u>, 215 Va. 263, 266, 208 S.E.2d 746, 748 (1974); <u>Keeter v. Commonwealth</u>, 222 Va. 134, 140 n.2, 278 S.E.2d 841, 845 n.2 (1981). According to the inevitable discovery exception "evidence obtained by unlawful means is nonetheless admissible 'if the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means.'" <u>Commonwealth v. Jones</u>, 267 Va. 532, 536, 593 S.E.2d 204, 206 (2004) (quoting <u>Nix</u>, 467 U.S. at 444).

Before reviewing the trial court's ruling that inevitable discovery principles compelled the denial of Bowe's motion to suppress, we must resolve a dispute between the parties as to whether this is a proper case to affirm the trial court's judgment for reaching the right result, while apparently misunderstanding the applicable law. <u>See</u> <u>Whitehead v. Commonwealth</u>, 278 Va. 105, 677 S.E.2d 265 (2009). Killian learned of the location of the drugs after he questioned Bowe in custody without having first issued <u>Miranda</u> warnings, and the transcript of the pretrial suppression hearing suggests that both the parties and the trial judge believed the Fifth Amendment exclusionary rule applied to prevent the admission of any evidence obtained as a result of Bowe's unwarned statement unless the police would inevitably have discovered the drugs in the absence of the <u>Miranda</u> violation. However, in <u>United States v. Patane</u>, 542 U.S.

630 (2004), the United States Supreme Court restricted the scope of the exclusionary rule applicable to violations of the <u>Miranda</u> rule. In <u>Patane</u>, five justices held that, when the police violate <u>Miranda</u>, the exclusionary rule operates to exclude any *statements* obtained as a result of the police questioning, but it does not affect the admissibility of "nontestimonial physical fruits" of the unwarned statements, unless the defendant's statement was involuntary within the meaning of the Fifth Amendment. <u>See</u> <u>id.</u> at 637-39 (plurality opinion); <u>id.</u> at 644-45 (Kennedy, J., concurring). At oral argument, counsel for Bowe conceded that Bowe's statement was voluntary. According to <u>Patane</u>, the trial court's ruling on Bowe's suppression motion – excluding Bowe's statement but not the physical fruits of the statement – was correct, even though the trial court appeared to be unaware of <u>Patane</u> and based its ruling on the inevitable discovery doctrine.

Bowe argues that in <u>Whitehead</u> our Supreme Court restricted the application of the right-result-wrong-reason analysis to cases in which the appellee argued the correct rationale to the trial court. The Commonwealth never argued to the trial court that, under <u>Patane</u>, the applicable exclusionary rule only demanded suppression of Bowe's unwarned statement. According to Bowe, it is, therefore, improper for us to consider <u>Patane</u>'s modification of the exclusionary rule in deciding this appeal. We think this reading of <u>Whitehead</u> is overly broad, particularly in light of language in the <u>Whitehead</u> opinion emphasizing that the right-result-wrong-reason analysis remains appropriate so long as the appellate court can determine whether or not the correct reason supports the trial court's ruling without the benefit of additional fact-finding.

> "[T]he proper application of this rule does not include those cases where, because the trial court has rejected the right reason or confined its decision to a specific ground, further factual resolution is needed before the right reason may be assigned to support the trial court's decision."

> Harris v. Commonwealth, 39 Va. App. 670, 675, 576 S.E.2d 228,
> 231 (2003), Blackman v. Commonwealth, 45 Va. App. 633,
> 642-643, 613 S.E.2d 460, 465 (2005) ("an appellee may argue for
> the first time on appeal *any legal ground in support of a judgment
> so long as it does not require new factual determinations*.")[.] *We
> agree with these holdings by the Court of Appeals.*

Whitehead, 278 Va. at 115, 677 S.E.2d at 270 (emphasis added). See also Perry v. Commonwealth, 55 Va. App. 122, 129-30, 684 S.E.2d 227, 230 (2009) (discussing Whitehead); Smith v. Commonwealth, 55 Va. App. 30, 48 n.10, 683 S.E.2d 316, 326 n.10 (2009) (same).

The facts in the record are that, without first giving Miranda warnings, Killian asked Bowe a question concerning drugs while Bowe was in custody, and Bowe's answer to the question led to the discovery of drugs. Given counsel's concession that Bowe's unwarned statement was voluntary, we do not need more facts to recognize that Patane's limitation to the scope of the Fifth Amendment exclusionary rule applies to this case. For the reasons given in Patane, the trial court's ruling – granting Bowe's motion to suppress his statement but denying his motion to suppress the drugs – properly enforced the exclusionary rule applicable to voluntary statements obtained in violation of Miranda. Given the facts in the record, Whitehead is perfectly consistent with our recognition that Patane applies to this case.

Even if we apply the Patane exclusionary rule – and, for the reasons mentioned above, we must – Bowe argues that the law still demands the reversal of his convictions. This is so, the argument continues, because the discovery of the drugs in this case was the tainted fruit of two alleged violations of the *Fourth Amendment*. It is true that, unlike voluntary statements obtained in violation of Miranda, violations of the Fourth Amendment generally require suppression of *both* unlawfully-seized evidence *and* suppression of other incriminating evidence derived from the unlawfully seized evidence, provided that the derivative evidence was seized as the result of police exploitation of the original illegality. See Wong Sun, 371 U.S. at 488, Harris v.

Commonwealth, 266 Va. 28, 34, 581 S.E.2d 206, 210 (2003). However, neither of the alleged Fourth Amendment violations suggested by Bowe required suppression of the drugs in this case.

According to Bowe, Killian acquired the drugs in violation of the Fourth Amendment by placing his hand into a rubber glove while asking Bowe whether he would retrieve the drugs himself or submit to Killian's retrieval of the drugs. Bowe argues that Killian's words and conduct amounted to a highly coercive ultimatum, rendering involuntary Bowe's subsequent personal retrieval of the drugs from his body cavity. See, e.g. Crosby v. Commonwealth, 6 Va. App. 193, 199, 367 S.E.2d 730, 734 (1988) ("Acquiescence is not consent."). Moreover, Killian's ultimatum came *after* Bowe's voluntary statement in violation of Miranda and *before* the police actually acquired the drugs. Thus, according to Bowe's argument, the seizure of the drugs is properly analyzed as an illegal seizure in violation of the Fourth Amendment.

Assuming without deciding that Killian's conduct violated the Fourth Amendment, see Luginbyhl v. Commonwealth, 48 Va. App. 58, 64, 628 S.E.2d 74, 77 (2006) ("an appellate court decides cases 'on the best and narrowest ground available'" (quoting Air Courier Conference v. Am. Postal Workers Union, 498 U.S. 517, 531 (1991) (Stevens, J. concurring))), the trial court's denial of Bowe's motion was still correct because, even if Killian's conduct had been otherwise, the police ultimately and inevitably would have discovered the drugs. Bowe's statement that he had drugs in his body cavity came before Killian's alleged Fourth Amendment violation. Pursuant to Patane, the only remedy for Killian's violation of Miranda was that no evidence of Bowe's unwarned statement would be admissible in his criminal trial. Given that the statement could be used for any other purpose, we think it highly unlikely that Bowe would have been admitted to bail by any magistrate who knew that Bowe had illegal drugs concealed in a body cavity. See Code § 19.2-120 (persons in custody "shall be admitted to bail by a judicial officer, *unless there is probable cause to believe . . . his liberty will constitute an unreasonable danger to*

*himself* or the public." (emphasis added)).  And after Bowe's admission to the jail as a pretrial detainee, the police would no longer need a warrant or exigent circumstances before conducting a body cavity search.  Compare King v. Commonwealth, 49 Va. App. 717, 644 S.E.2d 391 (2007), with Craddock v. Commonwealth, 40 Va. App. 539, 580 S.E.2d 454 (2003).

> In Craddock, the defendant was "'processed to go into jail' with the understanding that he had been 'brought into the sheriff's custody on a commitment brought by the magistrate for failure to appear.'" 40 Va. App. at 544, 580 S.E.2d at 457.  According to written policies at the detention center, and based on knowledge that law enforcement had recently discovered drugs hidden in Craddock's buttocks area, the deputies decided to conduct a strip search.  Id. at 544-45, 580 S.E.2d at 457.  During the course of the strip search, the deputies observed "a plastic bag with suspected narcotics between Craddock's 'butt cheeks.'"  Id. at 545, 580 S.E.2d at 457. A deputy was able to observe the plastic bag "without the need to spread Craddock's 'butt cheeks apart' or to 'manipulate his cheeks.'"  Id.
>
> The search in Craddock was conducted after the defendant had been committed to jail as a pretrial detainee, in accordance with written policies and only after the deputies had a stated reason to believe that Craddock was hiding contraband.  Id. at 544-45, 580 S.E.2d at 457.  The record also contained ample justification for searching Craddock, including testimony of previous attempts to smuggle drugs hidden in body cavities into the jail and the testimony of a physician that the amount of cocaine hidden by the defendant would have been lethal if the bag had burst.  Id. at 544-47, 580 S.E.2d at 457-59.  *In contrast, the record before us is devoid of any testimony that King was being admitted to a correctional facility.  And, unlike* Craddock, *there was no testimony concerning under what circumstances the deputies had authority to conduct this type of search at the lockup or why such a search would be appropriate.*

King, 49 Va. App. at 725-26, 644 S.E.2d at 395 (emphasis added).  Even in the absence of the alleged Fourth Amendment violation (Killian's ultimatum), Bowe almost certainly would have been denied bail and committed to the jail as a pretrial detainee.  Once inside, the deputies would have had a reason (Bowe's statement) to believe Bowe was hiding contraband.  King and Craddock suggest that these circumstances would have justified a body cavity search.  "It is

clear, at least 'by a preponderance of the evidence,' that the drugs 'ultimately and inevitably would have been discovered by lawful means.'"  Jones, 267 Va. at 538, 593 S.E.2d at 208 (quoting Nix, 467 U.S. at 444).

Finally, Bowe argues the police violated the Fourth Amendment by pulling his pants down and conducting an illegal strip search during the earlier search of Bowe at the scene of his arrest.  Killian testified that Bowe "clenched his buttocks" during this search, causing him to suspect Bowe might be carrying drugs.  Accordingly, the argument continues, Killian never would have asked his question about drugs in violation of Miranda, and the police would never have discovered the drugs, but for Killian's original violation of the Fourth Amendment.  But the success of this argument depends on our taking all the facts and related inferences in the light most favorable to Bowe, when, of course, our standard of review obliges us to do the opposite.  See Medley v. Commonwealth, 44 Va. App. 19, 24, 602 S.E.2d 411, 413 (2004) (*en banc*).  Bowe's cousin, Cabarrus, whose testimony the trial court found to be "completely truthful," stated that Hoggard, not Killian, was the police officer who searched Bowe and pulled his pants down at the scene of his arrest.  Because, on appeal, we must assume that Killian was not involved in the search that arguably violated the Fourth Amendment, Killian's own, apparently rejected, testimony of what he observed while conducting that search cannot logically connect the alleged Fourth Amendment violation and Killian's later discovery of the drugs.

IV.

Conclusion

For these reasons, we hold that the trial court did not err in denying Bowe's pretrial motion to suppress.  Bowe's convictions and sentences are affirmed.

Affirmed.