UNPUBLISHED

COURT OF APPEALS OF VIRGINIA


Present:   Judges Alston, Chafin and Senior Judge Annunziata
Argued by teleconference


COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
v.        Record No. 1744-14-4          JUDGE ROSSIE D. ALSTON, JR.
                                        FEBRUARY 13, 2015

ABDUL RAHMAN COLE


FROM THE CIRCUIT COURT OF THE CITY OF ALEXANDRIA
Lisa B. Kemler, Judge

Christopher P. Schandevel, Assistant Attorney General (Mark R.
Herring, Attorney General, on briefs), for appellant.

Kevin T. Gaynor for appellee.


Pursuant to Code § 19.2-398(A)(2), the Commonwealth appeals the trial court's decision

to grant appellee Abdul Rahman Cole's motion to suppress evidence obtained during a strip

search of appellee.  Specifically, the Commonwealth argues that the trial court erred in granting

appellee's motion to suppress because it applied the wrong legal standard in assessing the

constitutionality of the jail's strip search policy in light of the Supreme Court of the United

States' holding in Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington, 132 S. Ct.

1510 (2012).  We agree with the Commonwealth and thus, reverse the trial court's decision and

remand the case to the trial court for further proceedings.

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. Background[1]

The evidence indicated that on April 8, 2014, Alexandria Police Officer Tony Moore stopped appellee's vehicle for failure to maintain lane control. After stopping appellee, Officer Moore learned that he had an outstanding warrant in Arlington County for a failure to appear on a DUI charge. During a search of appellee's vehicle, Officer Moore found an open container of alcohol and a small round cigar containing what appeared to be marijuana inside of a McDonald's bag. After field-testing the substance in the cigar, Officer Moore told appellee that he was charging him with possession of an open container and possession of marijuana and transported appellee to the Alexandria Detention Center.

When Officer Moore and appellee arrived at the Alexandria Detention Center, Deputy Robert Roland met them in the sally port and conducted a pat-down search of appellee's outer clothing and the inside of his pockets. Officer Moore informed Deputy Roland about the Arlington warrant and the marijuana and open container charges. In light of the drug charge, Deputy Roland contacted his supervisor and obtained permission to "strip search" appellee.

Once in the room designated for strip searches, along with Officer Moore, Deputy Roland conducted a visual body cavity search of appellee, which included, among other requirements that appellee bend or squat so that Deputy Roland could observe his genital and buttock region. The search did not involve any physical contact from the officers. During the search, Officer Moore and Deputy Roland observed and, after a brief struggle with appellee, recovered a baggie from appellee's buttocks, which contained fourteen rocks of crack cocaine and a small amount of marijuana. After the strip search, Officer Moore then took appellee before the magistrate. There

---

[1] As the parties are fully conversant with the record in this case and because this memorandum opinion carries no precedential value, this opinion recites only those facts and incidents of the proceedings as are necessary to the parties' understanding of the disposition of this appeal.

is no evidence in the appendix as to whether the magistrate released appellee on bond or ordered him held in the detention facility.[2]

Subsequently, appellee moved to suppress, on two separate bases, the cocaine and marijuana found in the baggie, and the trial court held a hearing on appellee's motion on August 28, 2014. At the hearing, Officer Moore testified consistent with the facts set forth above. In addition, Deputy Roland testified to the Alexandria Detention Center strip search policy in place when appellee was arrested. The policy required a strip search for any person being booked for a drug or weapons charge, or for any crime of violence and required supervisors to approve a requested strip search, which could be denied if the supervisor determined the immediate charge did not justify the search. Detainees processed into the general population, however, are strip searched regardless of the charges against them.

At the conclusion of the hearing, the trial court denied appellee's motion to suppress on one of the grounds, and took the motion to suppress under advisement as to the constitutionality of the strip search. The trial court reconvened the hearing regarding the constitutionality of the strip search on September 11, 2014. Prior to the trial court ruling on the motion to suppress, the Commonwealth requested permission to put on more evidence in particular regarding the layout of the jail, the strip search policy, and the supervisory process. The defense objected to re-opening the evidence. The trial court ruled that because "everybody missed the Florence decision" prior to the first hearing, "it would be abuse of discretion not to allow the

---

[2] Appellee was ultimately indicted on the felony charges of possession of cocaine with intent to sell, give, or distribute, second offense, in violation of Code § 18.2-248, and attempt to impede a law enforcement officer by threats of bodily harm or force in violation of Code § 18.2-460, as well as the misdemeanor offense of possession of marijuana with intent to distribute in violation of Code § 18.2-248.1. Pursuant to the Court's authority to hear this appeal under Code § 19.2-398(A)(2), we only consider appellee's felony charges.

Commonwealth to . . . and the defense the opportunity to open the evidentiary record and make a full and complete record."

Lieutenant Joseph Penkey then testified in more detail regarding the layout of the jail, the booking area in particular, as well as the jail's strip search policy. Lieutenant Penkey testified that the first floor of the facility is "very mixed use" and includes the booking area, some specialized housing units, the control center, the visitor center, as well as some disciplinary and administrative segregation. Other floors contain the general population units. Inside the booking area there are twelve individual cells, three slightly larger cells that can each hold three detainees, and four "fairly large cells" that can hold larger groups of detainees.

There is a small area with about eighteen to twenty seats in front of the booking counter where people waiting to be processed, waiting to see a magistrate or waiting to be released or go to court, may sit. People sitting in the booking area are not handcuffed unless their behavior requires it. Nearby is a bank of phones where detainees are permitted to make phone calls. Lieutenant Penkey noted that inmates from the general population may be held in the segregation units or sober living unit on the first floor. Additionally, a general population inmate is usually assigned to clean the booking cells at night.

As for the jail's strip search policy, Lieutenant Penkey testified that when arrestees first arrive at the detention center, they are brought into a vehicle sally port where a deputy searches their outer clothing and pockets and takes certain property for safekeeping. If the arrestee is being charged with weapon or drug charges or weapons or drugs are found during the initial search of the arrestee, the deputy would contact the booking sergeant for a determination of whether the person should be strip searched. Once it is determined that a prisoner will be strip searched, the prisoner is escorted to a specific room for the search. If a detainee is not going to

be strip searched, he is taken to the booking area to wait to see the magistrate and then continues with the classification process. This process can take several hours.

Prisoners waiting to see a magistrate sit in the open booking area rather than in the group cells. Once they complete their initial processing, detainees usually are placed in group cells. Detainees granted bail usually remain in booking for about a day to give them an opportunity to make bail before being sent to general population. When detainees exit their cells to use the showers or the telephones, they may be in the same vicinity as the detainees awaiting booking who sit in the seats across from the booking desk. Detainees awaiting booking are also allowed to walk into the bathroom, which is located in a unit adjacent to the booking station. Normally four deputies work in the booking area. On average, about 25 detainees are in the booking area either in the cells or waiting to be processed in or out of the jail.

At the conclusion of the second hearing, the trial court granted appellee's motion to suppress the drugs found as a result of the strip search, holding that Florence was distinguishable and that this Court's decision in King v. Commonwealth, 49 Va. App. 717, 723, 644 S.E.2d 391, 394 (2007), governed the present case. This appeal followed.

II. Analysis

We review the evidence "in a light most favorable to [appellee], the prevailing party below, and we grant all reasonable inferences fairly deducible from that evidence." Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991) (quoting Commonwealth v. Holloway, 9 Va. App. 11, 20, 384 S.E.2d 99, 104 (1989)). "'Ultimate questions of reasonable suspicion and probable cause to make a warrantless search' involve questions of both law and fact and are reviewed *de novo* on appeal." McGee v. Commonwealth, 25 Va. App. 193, 197, 487 S.E.2d 259, 261 (1997) (*en banc*) (quoting Ornelas v. United States, 517 U.S. 690, 691 (1996)). "In performing such analysis, we are bound by the trial court's

- 5 -

findings of historical fact unless 'plainly wrong' or without evidence to support them and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." Id. at 198, 487 S.E.2d at 261 (citing Ornelas, 517 U.S. at 699).

"Under the Fourth Amendment, an officer's authority to conduct a 'full search' incident to arrest 'is only skin deep.'" Craddock v. Commonwealth, 40 Va. App. 539, 548, 580 S.E.2d 454, 459 (2003) (quoting Commonwealth v. Gilmore, 27 Va. App. 320, 328, 498 S.E.2d 464, 468 (1998)). "A different set of legal principles governs institutional searches of pretrial detainees being processed for admission in the general population of a penal facility." Id. at 549, 580 S.E.2d at 459. Even in the detainee context, "The Fourth Amendment prohibits only 'unreasonable searches and seizures,' Anderson v. Commonwealth, 20 Va. App. 361, 363, 457 S.E.2d 396, 397 (1995), not reasonable ones." King v. Commonwealth, 49 Va. App. 717, 723, 644 S.E.2d 391, 394 (2007).

> "The test of reasonableness . . . is not capable of precise definition or mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979). For every case, this test "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails." Id. Moreover, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."[3] Id.

King, 49 Va. App. at 723, 644 S.E.2d at 394 (footnote added).

The central issue before the Court is the applicability of Florence and the correct legal standard to be applied to determine the constitutionality of the Alexandria Detention Center's strip search of appellee. At the outset, we note that a strip search that involves a stranger peering

---

[3] We note that among the various types of searches performed on arrestees or detainees, the type of search involved in the present case constituted a "visual body cavity search," which goes beyond a standard "strip search" (an "'inspection of a naked individual, without any scrutiny of his body cavities'") and "'extends to a visual inspection of the anal and genital areas.'" Craddock, 40 Va. App. at 548, 580 S.E.2d at 459 (quoting Kidd v. Commonwealth, 38 Va. App. 433, 446, 565 S.E.2d 337, 343 (2002)).

without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy. The Supreme Court has said, in respect to a schoolchild (and a less intrusive search), that the meaning of such a search, and the degradation its subject may reasonably feel, place a search that intrusive in a category of its own demanding its own specific suspicions. Safford Unified School Dist. #1 v. Redding, 557 U.S. 364 (2009).

The Commonwealth argues that Florence announced a broad rule authorizing blanket policies for strip searches of classes of detainees - without requiring reasonable suspicion to strip search individual detainees - in order to ensure jail security. Further, the Commonwealth asserts that the trial court failed to apply the correct legal standard to its assessment of the jail's policy in this case, which requires that "deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." Florence, 132 S. Ct. at 1518 (citing Block v. Rutherford, 468 U.S. 576, 584-85 (1984)). Appellee, however, argues that Florence does not apply to the facts of this case because its holding does not extend to detainees whose detention statuses have not been reviewed by a magistrate and who are held separately from the general population of a jail.

In Florence, the Supreme Court addressed the question of "whether undoubted security imperatives involved in jail supervision override the assertion that some detainees must be exempt from the more invasive search procedures at issue absent reasonable suspicion of a concealed weapon or other contraband." Id. The petitioner in Florence was arrested on an apparently outdated arrest warrant for a failure to appear at an enforcement hearing and taken first to a detention center and then transferred to a correctional facility before the warrant was ultimately dismissed and he was released. Id. at 1514. At both facilities, petitioner was subjected to visual body cavity searches pursuant to the facility procedures requiring these searches of all detainees regardless of the circumstances of their arrests, their suspected offenses,

behavior, demeanor, or criminal history.  Id.  Petitioner argued that "persons arrested for a minor offense could not be required to remove their clothing and expose the most private areas of their bodies to close visual inspection as a routine part of the intake process."  Id. at 1514-15.  "Rather . . . officials could conduct this kind of search only if they had reason to suspect a particular inmate of concealing a weapon, drugs, or other contraband."  Id. at 1515.  The Court upheld the searches and policies behind them, holding that "every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed."  Id. at 1513.

In support of its holding, the Court underscored the "importance of deference to correctional officials" and acknowledged their "significant interest in conducting a thorough search as a standard part of the intake process."  Id. at 1516, 1518.  Citing several studies, the Court discussed the health and safety reasons supporting policies requiring strip searches for detainees prior to their admission into a detention facility, and concluded that

> [i]t is not surprising that correctional officials have sought to perform thorough searches at intake for disease, gang affiliation, and contraband.  Jails are often crowded, unsanitary, and dangerous places.  There is substantial interest in preventing any new inmate, either of his own will or as a result of coercion, from putting all who live or work at these institutions at even greater risk when he is admitted to the general population.

Id. at 1520.  As extensively discussed in Florence, the proliferation of drugs or weapons throughout a jail presents a serious security and health risk to all detainees and employees of the facility.  "The difficulties of operating a detention center must not be underestimated by the courts."  Id. at 1515 (citing Turner v. Safley, 482 U.S. 78, 84-85 (1987)).  "Detecting contraband concealed by new detainees . . . is a most serious responsibility.  Weapons, drugs, and alcohol all disrupt the safe operation of a jail."  Id. at 1519 (citation omitted).  Drugs pose a specific risk in that "[t]he use of drugs can embolden inmates in aggression toward officers or each other; and,

even apart from their use, the trade in these substances can lead to violent confrontations." Id. (citation omitted). Indeed, "[s]omething as simple as an overlooked pen can pose a significant danger. Inmates commit more than 10,000 assaults on correctional staff every year and many More among themselves." Id. (citing Dept. of Justice, Bureau of Justice Statistics, J. Stephan & J. Karberg, Census of State and Federal Correctional Facilities, 2000, p. v (2003)).

Given these serious concerns, the Court rejected petitioner's argument that more invasive strip searches need not be conducted for detainees not arrested for a serious crime or on weapon or drug charges because "the seriousness of the offense is a poor predictor of who has contraband" and "it would be difficult in practice to determine whether individual detainees fall within the proposed exception." Id. at 1520. Thus, Florence set forth a general rule that detainees being admitted to the general population of a jail facility could be strip searched without individualized reasonable suspicion regardless of the severity of the charges they faced. Id. at 1513.

The Commonwealth argues that Florence directly applies to the case at hand and authorizes the type of visual body cavity search to which appellee was subjected. We agree. In the present case, appellee was transported to the Alexandria Detention Center booking area, which may be populated by around 25 other detainees in various stages of the commitment process at any given time. The detainees in the booking area may be awaiting their appearance before a magistrate, awaiting payment of bond, going through the classification and assessment process before admission to the general population, or waiting to go to court. These detainees are not necessarily handcuffed and wait either in rows of plastic chairs in the common booking area, or held in group or individual cells on the first floor of the facility. The group cells hold a minimum of three detainees at any given time. "Most of the time," detainees held in the booking area are placed in the group cells rather than the individual cells, which are generally reserved

for detainees whose medical or behavioral status requires their isolation. Detainees are allowed to exit their cells, without handcuffs, to shower, use the bathroom, or make telephone calls. During those times they are usually escorted by officers; however there are usually only four deputies working in the booking area.

General population inmates also travel through the booking area and other areas of the first floor. Some are held in the segregation or sober living unit and others may be assigned to clean the cells in the booking area at night. Additionally, general population inmates may pass through the booking area on their way to and from court.

The facts of this case align with, and therefore our conclusion is guided by, <u>Florence</u>. While appellee was not yet being processed into the "general population" of the jail, he was being admitted to the booking area where he would commingle with detainees who committed crimes ranging in severity, were at various stages of the booking or commitment process, and all of whom presented possible opportunities for appellee to "pass off" the drugs hidden on his person. Maintaining safety and order at correctional institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face. The <u>Florence</u> decision has confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld if it "has a 'valid, rational connection' to a legitimate governmental interest." <u>Overton v. Bazzetta</u>, 539 U. S. 126, 132 (2003) (quoting <u>Turner</u>, 482 U.S. at 89-91). We find that from the very well developed record in this matter and the particular facts presented, <u>Florence</u> authorizes a strip search here and therefore, the trial court erred by granting appellee's motion to suppress.

<u>Reversed and remanded.</u>