PRESENT: All the Justices

COMMONWEALTH OF VIRGINIA

                                                       OPINION BY

v. Record No. 240310                     JUSTICE D. ARTHUR KELSEY
                                           SEPTEMBER 11, 2025

SHANTA ORLANDO HUBBARD, A/K/A
SHAWN HUBBARD

FROM THE COURT OF APPEALS OF VIRGINIA

After denying a motion to suppress, the trial court convicted Shanta Orlando Hubbard of possession with intent to distribute cocaine. The Court of Appeals vacated Hubbard's conviction, holding that the trial court had erred in denying Hubbard's motion to suppress. *See Hubbard v. Commonwealth*, 80 Va. App. 384, 414 (2024). Disagreeing with the Court of Appeals, we reverse its opinion and reinstate Hubbard's conviction.

I.

When reviewing the denial of a suppression motion in a criminal case, an appellate court must view "the facts 'in the light most favorable to the Commonwealth, giving it the benefit of any reasonable inferences.'" *Commonwealth v. White*, 293 Va. 411, 413-14 (2017) (citation omitted). "This standard requires us 'to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers.'" *Id.* at 414 (citation omitted). Additionally, "[w]hen considering whether to affirm the denial of a pretrial suppression motion, an appellate court reviews not only the evidence presented at the pretrial hearing but also the evidence later presented at trial." *Id.*; *see also Durham v. Commonwealth*, 303 Va. 290, 321 (2024).

A.

Officer Garrett Waterman initiated a traffic stop of Hubbard's pickup truck after he had observed it pulling in front of a vehicle and causing that vehicle "to brake-check to prevent themselves from actually striking the side of [Hubbard's] pickup truck." J.A. at 284. As

Hubbard's truck passed by, the officer also "noticed that the rear window tint . . . appeared to be too dark." *Id.* The officer approached the truck after the stop, which he later discovered was a rental vehicle, and identified Hubbard as the driver and Dequan Jackson as the passenger. The officer asked Hubbard and Jackson to exit the truck after he "detected the odor of marijuana coming from inside of the vehicle" and "identified that Mr. Hubbard had an active Fourth Amendment rights waiver."[1] *Id.* at 288; *see also id.* at 106.

After additional officers arrived to assist, Officer Waterman searched the truck. He discovered "green plant material on the floorboards of the driver and passenger" sides, *id.* at 289, which the officer suspected was "marijuana shake," or small pieces of marijuana that fall from a grinder used to grind marijuana for a joint or blunt, *id.* at 106. The officer also found bags with white and brown powder on the passenger floorboard, which were "knotted up" and "packaged consistent with illegal narcotics." *Id.* at 108-09, 289. Following the discovery of marijuana and potential controlled substances, the officers placed both Hubbard and Jackson in handcuffs.

Officer Waterman next searched Hubbard beside the passenger side of his police vehicle. He first found "three separate large wads of cash" in Hubbard's shorts pockets, which were in "different denominations" and added up to "approximately $2,000." *Id.* at 296. At this point, the officer testified, various factors increased his sense of danger. He had discovered "marijuana" and other potential controlled substances in the vehicle as well as "large denominations of cash" in Hubbard's pocket. *Id.* at 117-18. He had stopped Hubbard's "rental

---

[1] As part of a 2012 plea agreement, Hubbard agreed "to waive his Fourth Amendment right against a warrantless search for a period of TEN (10) years from the date of sentencing." J.A. at 543-44. The waiver included consent "to a warrantless search of his person, place of residence or any vehicle he is occupying, at any time of the day or night by any law enforcement officer during this period." *Id.* at 543. Hubbard also agreed "that any evidence seized from such search shall be admissible in any hearing or trial resulting therefrom." *Id.*

vehicle"[2] leaving a "high crime or high drug area" early in the morning, *id.* at 291; *see also id.* at 118, where police "see a lot of the criminal activity that occurs in the city," such as "violent crime, narcotics activity, firearm violations, [and] shot[s] fired," *id.* at 120.

Officer Waterman continued the search next to his police vehicle by reaching the "blade of [his] hand" into Hubbard's "buttocks and groin area." *Id.* at 297. The officer suspected "that Mr. Hubbard may be transporting some type of narcotic" based upon the officer's experience in arresting a "tremendous amount" of "people who have concealed an illegal narcotic in the area of their buttocks or down in their groin." *Id.* at 121. That practice was the "most common way" that "narcotics" and "weapons" make "their way into the jail." *Id.* The officer also believed it was "important" to make sure that Hubbard was not concealing a "firearm" in the "groin and buttocks area." *Id.*

Before beginning this stage of the search, the officer informed Hubbard that he was going to "unbutton [his] shorts" but not "let them drop." Commonwealth's Ex. 3 at 22:28 to 22:31. Because Hubbard was "wearing a type of shorts that would have made it difficult to feel an object," the officer went "inside of his shorts" but "remained outside of his underwear to ensure that there was still a layer of clothing protecting him." J.A. at 116-17. When Officer Waterman used the "blade of [his] hand," "[o]utside of [Hubbard's] boxer shorts," the officer "felt a large rock-like object that in [his] opinion clearly didn't belong there" and "was potentially a controlled substance." *Id.* at 122-23. The officer suspected the substance was a distributable

---

[2] Officer Waterman explained that the use of a "rental vehicle, in itself, isn't necessarily suspicious," *id.* at 118, but coupled with other factors, it can be. In his experience, the officer testified, drug traffickers using rental vehicles in high-crime areas know that rental vehicles are typically well maintained and thus less likely to "get stopped in a traffic stop." *Id.* at 119. The "other thing" drug traffickers know is that when police "run the tag on a rental car, we're not getting a return on that vehicle, who it's registered to. We really can't investigate much further into who could be operating the vehicle." *Id.*

amount because he "could feel how large the object was" and that "it felt like numerous hard rock-like substances." *Id.* at 156.

Up until this point, Hubbard had been "calm" and cooperative, but his behavior changed as soon as the officer started swiping the outside of Hubbard's underwear. *Id.* at 296-98. Hubbard "initially tried putting his hands down the back of his pants" as if "he was trying to reach for the item." *Id.* at 297. He was also "clenching his buttocks," "moving around," and "just taking measures to try and prevent [the officer] from being able to recover the evidence." *Id.* at 297-98. At one point, Officer Waterman exclaimed, "He's going to try and get rid of it on the way to jail." *Id.* at 129.

One of the officers had to hold Hubbard's handcuffed hands up because Hubbard "attempted to reach down in his shorts numerous times." *Id.* at 123. Officer Waterman then pulled back Hubbard's underwear to visually look for the item. At this point, the item "was inside of his underwear" and "just sitting down between his buttocks and his underwear." *Id.* at 298; *see also id.* at 126. The item was "partially between his butt cheeks" but not "up inside of his anus." *Id.* at 126. The officer could easily see the item in Hubbard's underwear and "didn't have to go inside his buttocks to feel the item." *Id.* at 332.

At this point, Officer Waterman was concerned that Hubbard's actions could result in the "destruction of evidence" and cause harm to Hubbard "if he were to break the bag" given the "inherent dangers of fentanyl," which "could be deadly to every single person that was standing out there." *Id.* at 299-300. The officer was involved in a previous case where a man had overdosed in the back of the officer's police vehicle from a burst bag of controlled substance after the officer had waited to remove a foreign object that felt like a controlled substance in the man's buttocks area. *See id.* at 132. Because of this risk, Officer Waterman had been

4

specifically instructed by his command to no longer field test "bags of white powder" because "[f]entanyl has become so dangerous in today's time that a simple poof of that powder that could reach our nostrils could kill us." *Id.* at 157-58.

The officers momentarily lost their grip on Hubbard's loosened shorts while switching places with each other, causing the shorts to fall to the ground for approximately two seconds before the officers were able to pull them back up again. *See* Commonwealth's Ex. 3 at 24:38 to 24:42. Hubbard's underwear, however, remained up, and his genitals and buttocks were never publicly exposed. No person nearby would have been able to see Hubbard's underwear, buttocks, or genitals other than the two officers searching him. *See* J.A. at 129.

The officers decided to pause the search while Hubbard continued his efforts to prevent them from retrieving the item. *See* Commonwealth's Ex. 3 at 25:20 to 25:28. A few minutes later, Officer Waterman's supervisor directed him to retrieve the item from Hubbard's underwear because "[a]ny time there's illegal narcotics involved, it's a danger to the person themselves," and there is a risk that Hubbard would "damage that evidence . . . knowing that he could easily shake that down his pant leg and scuff it out onto the ground." J.A. at 364-65. As to the possible damage to the evidence, the supervising officer reasoned that he "may not be able to recover" the drugs from the ground and that it "would be the difference between a possession charge and a potential distribution charge." *Id.* at 146.

The officers conducting the search then held Hubbard's hands up and leaned Hubbard against the police vehicle so that Officer Waterman could retrieve the item. At the time of retrieval, the item "was right down between his buttocks and his underwear." *Id.* at 305. Officer Waterman retrieved a plastic bag containing 1 bag of cocaine and 87 smaller bags of crack cocaine. The plastic bag was not damaged and did not have "bodily fluid or other bodily items"

on it. *Id.* at 135. No evidence suggested that the officers ever touched Hubbard's external or internal anal sphincter. After the item was retrieved, Hubbard was placed under arrest for possession with intent to distribute.

B.

Before trial, Hubbard filed a motion to suppress "all evidence seized as a result of an illegal stop and illegal search of his person." *Id.* at 12. Hubbard contended that Officer Waterman "egregiously perform[ed] a body cavity search" and that "[e]ven in light of [his] Fourth Amendment waiver, a warrantless body cavity search is peculiarly intrusive and does not fall within the scope and consent of the waiver." *Id.* at 13-14. Hubbard further argued that Officer Waterman violated the heightened standard for intrusive bodily searches under the Fourth Amendment because he "did not have either a clear indication that evidence was located within Mr. Hubbard's body" nor "exigent circumstances that would allow a warrantless body cavity search." *Id.* at 14.

The trial court denied Hubbard's motion at the conclusion of the suppression hearing and incorporated its reasoning from the bench into its denial order. The trial court held that Officer Waterman "had sufficient information to believe that there was an indication that a controlled substance was located" on or in Hubbard's person "based on the cash that was on his person, based on the shake in the vehicle and the odor of marijuana." *Id.* at 190. The trial court also held that there were exigent circumstances because fentanyl, either on its own or combined with other controlled substances, was "dangerous and harmful . . . not only to those that are using it and transporting it without a license to do so" but also "to any officer that is exposed to it in any sort of manner." *Id.* at 190-91.

6

On appeal to the Court of Appeals, Hubbard challenged the trial court's denial of his motion to suppress, arguing that Officer Waterman's search of Hubbard was unreasonable under the Fourth Amendment. The Court of Appeals reversed Hubbard's conviction, holding that the evidence should have been suppressed because the search violated the Fourth Amendment. *See Hubbard*, 80 Va. App. at 413-14. A heightened standard applied under the Fourth Amendment, the Court of Appeals reasoned, because this was an "intrusive bodily search." *Id.* at 401-02. The Court of Appeals did not "resolve whether a body 'cavity' includes the area between a clamped-together posterior because whether the search was a strip search or something more intrusive," such as a manual or visual body cavity search, "it needed to be supported by exigent circumstances," which it concluded the record did not support. *Id.* at 407.

While the Court of Appeals agreed with the trial court that there was a clear indication that the object felt by Officer Waterman in Hubbard's buttocks and groin area contained a controlled substance, it disagreed with the trial court that there were exigent circumstances justifying such an "invasive search." *Id.* at 406-14. The Court of Appeals opined that the potential risk of fentanyl was not an exigent circumstance, finding that the record did not contain "actual information" to tie the object felt on Hubbard's person to be anything more than a "theoretical possibility" and a "mere chance" that it was fentanyl. *Id.* at 409.

The Court of Appeals also rejected other theories of exigency presented by the Commonwealth, such as the destruction of evidence and the potential harm to the health and safety of Hubbard himself if the bag burst and caused an overdose. The Court of Appeals reasoned that there was insufficient evidence presented in the record to support these alternative exigencies without further factual development, and thus, the "right result wrong reason doctrine" could not be applied. *See id.* at 410-11.

7

II.

On appeal to us, the Commonwealth contends that the Court of Appeals erred by misapplying the governing Fourth Amendment standard and by failing to view the evidence in the light most favorable to the Commonwealth. We agree and reinstate Hubbard's conviction.

A.

Both the literal text of the Fourth Amendment and its historical context establish that the "ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley* v. *California*, 573 U.S. 373, 381-82 (2014) (citation omitted); *see Hill v. Commonwealth*, 297 Va. 804, 822 (2019). "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (emphasis in original) (citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving." *Ryburn v. Huff*, 565 U.S. 469, 477 (2012) (per curiam). Given the misleading confidence of hindsight, the Supreme Court of the United States has counseled that "judges should be cautious about second-guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation." *Id.*

This ultimate Fourth Amendment standard — objective reasonableness — governs the reasons for the seizure of an individual and the justifications for the intrusiveness of any search of the person seized. The least intrusive seizure, an investigatory detention, is authorized when an officer has a "reasonable suspicion" that a suspect "is, or is about to be, engaged in criminal activity." *Hill*, 297 Va. at 813 (emphasis and citation omitted). The intrusiveness of searching a detained suspect begins and often ends with a pat-down of the suspect's outer clothing for

8

possible weapons. *See* 5 Ronald J. Bacigal & Corinna Barrett Lain, Virginia Practice Series: Criminal Procedure § 3:4, at 69, 72-73 (2024-2025 ed.). If either the plain-feel or plain-smell doctrine applies, the search can extend to searching for contraband or other evidence of criminality. *Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993); *Cost v. Commonwealth*, 275 Va. 246, 251-52 (2008); *Bunch v. Commonwealth*, 51 Va. App. 491, 496-97 (2008).

The "probabilistic formulation" is heightened to "probable cause" when suspects are subject to a custodial arrest. *Hill*, 297 Va. at 815. "When used as a standard of calibrating certitude, '[t]he very phrase "probable cause" confirms that the Fourth Amendment does not demand all possible precision.'" *Evans v. Commonwealth*, 290 Va. 277, 287 (2015) (quoting *Herring v. United States*, 555 U.S. 135, 139 (2009)). "To be sure, probable cause is 'less demanding than a standard requiring a preponderance of the evidence,'" *id.* (citation omitted), and "does not demand any showing that such a belief be correct or more likely true than false," *Curley v. Commonwealth*, 295 Va. 616, 622 (2018) (citation omitted).

Routine searches of an arrestee incident to a lawful arrest need no additional justification beyond the arrest itself. "Well before the Nation's founding, it was recognized that officers carrying out a lawful arrest had the authority to make a warrantless search of the arrestee's person." *Birchfield v. North Dakota*, 579 U.S. 438, 458 (2016); *see also* William J. Cuddihy, The Fourth Amendment: Origins and Original Meaning 602-1791, at 420 (2009). "No historical evidence suggests that the Fourth Amendment altered the permissible bounds of arrestee searches." *Birchfield*, 579 U.S. at 458. This doctrine has been stable for over a century. An officer has a professional duty and the constitutional authority "to search the person of the accused when legally arrested to discover and seize the fruits or evidence of crime." *Weeks v.*

*United States*, 232 U.S. 383, 392 (1914). Eschewing probability formulas, the "permissibility" of searches incident to arrest

> does not depend on whether a search of a *particular* arrestee is likely to protect officer safety or evidence: "The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect." Instead, the mere "fact of the lawful arrest" justifies "a full search of the person."

*Birchfield*, 579 U.S. at 460 (emphasis in original) (citations omitted).

The bright line justifying a search incident to arrest, however, blurs when the physicality of the search becomes highly intrusive. *See McCloud v. Commonwealth*, 35 Va. App. 276, 282-83 (2001). Though different expressions have been used by different courts, the outer boundaries of intrusiveness are often described by the categories of strip searches, visual body cavity searches, and manual body cavity searches. *See generally* John Costello, Virginia Criminal Law and Procedure § 36.5[2], at 563 (4th ed. 2008); Bacigal & Lain, *supra*, § 4:20, at 141. A strip search typically involves "an inspection of a naked individual, without any scrutiny of his body cavities." *Kidd v. Commonwealth*, 38 Va. App. 433, 446 (2002). A visual body cavity search goes further and "extends to a visual inspection of the anal and genital areas." *Id.* (citation omitted). A "manual body cavity search," the most intrusive search, entails "some degree of touching or probing of body cavities." *Id.* (citation omitted).

When the physical manner of a search incident to arrest arguably offends the basic reasonableness limitation of the Fourth Amendment, courts apply (as the Court of Appeals did here) a "heightened standard" that requires a "special justification" for searches that are peculiarly intrusive. *Hubbard*, 80 Va. App. at 400-04 (citing *Moss v. Commonwealth*, 30 Va. App. 219, 224 (1999); *Taylor v. Commonwealth*, 28 Va. App. 638, 642 (1998); *Hughes v.*

*Commonwealth*, 31 Va. App. 447, 456 (2000) (en banc); *Commonwealth v. Gilmore*, 27 Va. App. 320, 330-31 (1998)). Many courts look to the exigent-circumstances doctrine to determine whether a special justification validates an intrusive bodily search. *See, e.g., id.* at 402-03 (citing *Gilmore*, 27 Va. App. at 330-31); *King v. Commonwealth*, 49 Va. App. 717, 726 (2007); *Moss*, 30 Va. App. at 226. It is not an analytically perfect fit, however, because the exigent-circumstances doctrine serves as an ad hoc, "case-by-case" exception to the warrant requirement. *Birchfield*, 579 U.S. at 457. In contrast, the search-incident-to-arrest doctrine is an outright exception to the warrant requirement. It is applied "categorically," not in a "case-specific" manner, pursuant to "the long-established rule that a warrantless search may be conducted incident to a lawful arrest." *Id.*

B.

In the present case, we need not parse out the micro differences between these doctrines. We are confident that the meta principle — "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated," U.S. Const. amend. IV — provides sufficient guidance to determine whether Officer Waterman's retrieval of the bag of drugs from Hubbard's underwear was reasonable under the circumstances of this case. After hearing the evidence and weighing the credibility of the witnesses, the trial court held it was legally and factually reasonable. Applying the governing Fourth Amendment principles and viewing the record through the proper standard of appellate review, we agree.

The evidence established that the physical search of Hubbard occurred after the officers had probable cause to arrest him for drug possession due to the smell of marijuana and the

discovery of marijuana shake and suspected bags of controlled substances in the vehicle.[3] *See generally Maryland v. Pringle*, 540 U.S. 366, 372 (2003) (finding probable cause for arresting "any or all three of the occupants" in a vehicle for the "crime of possession of cocaine, either solely or jointly"). The officers thus had the authority to conduct a search incident to arrest.[4]

During this search, Officer Waterman did not undress Hubbard fully or partially. His naked body was never exposed to the public. The officer discovered the "large rock-like object," J.A. at 123, while Hubbard was fully clothed. At that time, the officer was patting down the outside of Hubbard's underwear underneath his shorts. The officer later pulled the waistband of Hubbard's underwear out far enough to see the suspected bags of contraband and retrieve them. At no point were Hubbard's underwear pulled down or off. The bags of cocaine were "just sitting down between [Hubbard's] buttocks and his underwear." *Id.* at 298; *see also id.* at 126. The bags were not "up inside of his anus." *Id.* at 126. The officer could easily see the bags and "didn't have to go inside his buttocks to feel the item." *Id.* at 332.[5] The plastic bag (containing

---

[3] The search occurred in June 2020 prior to the enactment of Code § 4.1-1302.

[4] The later timing of Officer Waterman's formal declaration of arrest does not change the result in this case. "[W]hen 'the formal arrest follow[s] quickly on the heels of the challenged search,' it is not 'particularly important that the search preceded the arrest rather than vice versa,' 'so long as probable cause existed at the time of the search.'" *Joyce v. Commonwealth*, 56 Va. App. 646, 657 (2010) (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 111 (1980); *Slayton v. Commonwealth*, 41 Va. App. 101, 108 (2003)). "[A] constitutionally permissible search of the person incident to arrest may be conducted by an officer *either before or after* the arrest if the search is contemporaneous with the arrest." *Italiano v. Commonwealth*, 214 Va. 334, 336 (1973) (emphasis in original); *see also Brown v. Commonwealth*, 270 Va. 414, 418 n.1 (2005) (finding it inconsequential that the officer searched the suspect "before officially arresting him"). *See generally* Bacigal & Lain, *supra*, § 4:20, at 138-39.

[5] The Court of Appeals stated that Officer Waterman "probed [Hubbard's] buttocks while trying to remove the item." *Hubbard*, 80 Va. App. at 407. Viewed in the light most favorable to the prevailing party below, the evidentiary record does not support this assertion.

12

87 smaller baggies) was not damaged and did not have "bodily fluid or other bodily items" on it. *Id.* at 135.

In several ways, the fact pattern of Hubbard's case parallels *McCloud*, which also involved an officer who pulled an arrestee's underwear out to retrieve a bag of illegal drugs during a search incident to an arrest. 35 Va. App. at 279. The officer "reached in 'two inches' and pulled the plastic bag [of illegal drugs] out of the front of appellant's underwear. Although the officer pulled back the appellant's underwear in the front, he did not see the appellant's genitals." *Id.* The Court of Appeals found it dispositive that the "appellant's clothing was not removed," "his genital area was not exposed," and the "officers made no visual inspection of appellant's genitals" nor "touch[ed]" them. *Id.* at 283-84. Surveying the state of the law at that time, *McCloud* "found no cases that characterize a strip search as other than partial or total disrobement." *Id.* at 283.

Also informative is *Craddock v. Commonwealth*, in which the Court of Appeals evaluated the constitutional propriety of strip searching an arrestee charged with failing to appear on a felony narcotic charge. 40 Va. App. 539, 547 (2003). While the officer was transporting the arrestee to a detention center, the dispatcher advised the officer that the arrestee was known to keep "drugs 'hidden in his underwear' and 'was known to carry drugs in his buttock area.'" *Id.* at 543. When they arrived at the detention center, the officers "pulled [the arrestee's] pants down" and "observed a plastic bag with suspected narcotics between [his] 'butt cheeks.'" *Id.* at 545. "[A]ll [they] had to do was pick it up." *Id.* at 550. They did not "have to pull it out" of the arrestee's anus or make "a specific visual or manual examination of his anal cavity." *Id.* These facts, *Craddock* held, did not constitute a "visual or manual body cavity search." *Id.* And it was fully justified as a strip search for two reasons. First, "the entry of drugs into the facility

13

compromised the safety of inmates and officers alike." *Id.* at 551.  And, second, arrestees transported to the detention center, the Court of Appeals observed, "faced an additional danger, possibly a lethal one, of drugs being released into the rectal membranes." *Id.*

To answer the question presented in Hubbard's case, we need not delineate the exact definitional distinctions between the various categories of invasive body searches.  The circumstances of this case, we believe, justify the officer's conduct no matter what label we put on the challenged search.  Officer Waterman removed the bag from Hubbard's underwear while he was physically resisting the search.  If Hubbard "were to break the bag," J.A. at 299, it would have spilled out its contents in the immediate presence of the restraining officers, Hubbard, and the other passenger.  Officer Waterman had been instructed by his command to not field test "bags of white powder" because of the risk that they may be laced with fentanyl, which "has become so dangerous in today's time that a simple poof of that powder that could reach [their] nostrils could kill [them]." *Id.* at 157-58.  Given the "inherent dangers of fentanyl," breaking open a bag containing it "could be deadly to every single person that was standing out there." *Id.* at 299-300.  Officer Waterman's safety, the safety of his colleagues, and even the safety of Hubbard and the other passenger justified eliminating this patently unreasonable risk.

As Officer Waterman testified, the life-threatening risk to Hubbard was not some fanciful speculation.  In a previous arrest of another suspected drug dealer, Officer Waterman had felt a bag of suspected drugs in an arrestee's underwear.  Instead of removing the bag on the scene, Officer Waterman decided to put that task off until he had delivered the arrestee to jail.  In transit, the bag burst, and the arrestee "overdosed" in the back of Officer Waterman's police vehicle. *See id.* at 132.  It was factually prudent and legally reasonable for Officer Waterman to

avoid taking that risk with Hubbard regardless of the type of potential controlled substance that the bag may have contained.

Further supporting the objective reasonableness of the search was Officer Waterman's duty to ensure that evidence of the crime was not damaged or destroyed. While physically resisting the search, Hubbard knew that the bags of cocaine would eventually be discovered in his underwear. Hubbard's actions presented a reasonably foreseeable risk of "damag[ing] that evidence . . . knowing that he could easily shake that down his pant leg and scuff it out onto the ground." *Id.* at 364-65. The supervising officer on the scene understood that they "may not be able to recover" the drugs from the ground and that it "would be the difference between a possession charge and a potential distribution charge." *Id.* at 146. Preventing an "imminent destruction of evidence" is a well-recognized exigent circumstance that factors into the reasonableness calculus of the Fourth Amendment. *See Kentucky v. King*, 563 U.S. 452, 460 (2011) (citation omitted).

Finally, we acknowledge Hubbard's claim that the real reason for the intrusive nature of his search was Officer Waterman's belief that Hubbard's "active Fourth Amendment rights waiver," *supra* note 1 and accompanying text, authorized any form of physical search. *See* Oral Argument Audio at 18:05 to 18:19, 26:50 to 27:55. Controlling precedent, however, has "'repeatedly rejected' a subjective approach, asking only whether 'the circumstances, viewed *objectively*, justify the action.'" *King*, 563 U.S. at 464 (emphasis in original) (quoting *Brigham City*, 547 U.S. at 404); *see also Mason v. Commonwealth*, 291 Va. 362, 368-69 (2016). In the present case, the objective facts in the evidentiary record demonstrate the constitutional reasonableness of Officer Waterman's search of Hubbard. Regardless of any subjective motive

by the officer, those motives play no role in the legal determination of the objective reasonableness of the search.

III.

In sum, the trial court correctly denied Hubbard's motion to suppress the incriminating evidence against him. The Court of Appeals erred in concluding otherwise. The search incident to Hubbard's arrest fully comported with Fourth Amendment standards.

*Reversed and final judgment.*